# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

STEVEN OLSEN,

                   Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

                   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

CV F 04 6252 DLB

ORDER REGARDING PLAINTIFF'S
SOCIAL SECURITY COMPLAINT

## BACKGROUND

Plaintiff Steven Olsen ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and period of disability pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On April 12, 2005, the Honorable Oliver W. Wanger reassigned the case to the undersigned for all purposes.

1

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application for disability insurance benefits and period of disability on June 24, 2002, alleging disability since October 22, 1997, due to "head trauma- get migraine headaches at a drop of a hat." AR 54-56, 69-78. After being denied both initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 29-32, 34-37, 39. On May 15, 2003, ALJ Robert Ryan held a hearing. AR 263-299. On September 12, 2003, ALJ Ryan found that Plaintiff was not disabled. AR 11-24. On August 9, 2004, the Appeals Council denied review. AR 5-8.

Hearing Testimony

On May 15, 2003, ALJ Ryan held a hearing in Stockton, California. AR 263-299. Plaintiff appeared along with his attorney, Robert Lewis. AR 263. Vocational expert Steven Schmidt also appeared and testified. AR 263.

Plaintiff testified that he was 52 years old at the time of the hearing. AR 267. He graduated high school and has been a welder for 20 years. AR 267-268. In August 1996, while working, he was struck in the back of the head and back by a large pipe. AR 268. Since this accident, he has needed glasses, has constant ringing in his ears that changes tones and has constant headaches. AR 269. His doctor told him that the headaches are caused by "smashed" vessels in the back of his head that create headaches when he exerts himself too much or "tries to think too much or do anything." AR 269. He has a hard time bending over and stooping because of his back. AR 269. He also gets confused. AR 269. He has tried to work since the accident, but was unable to do so because he missed work because of his headaches or was unable to lift while at work. AR 269.

Plaintiff lives with his girlfriend, Barbara Staggs. AR 270. He usually wakes at 4:00 or 4:30 a.m. and dresses and bathes himself. AR 271. He does some household chores. AR 271. He does his own dishes, cooks, and washes his own clothes. AR 282. He drives his girlfriend to the store and she does the shopping. AR 271. He does a little bit of yard work, feeds the cattle

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

and takes care of their three dogs.  AR 271, 274.  He listens to the television for two to three hours a day because watching it causes headaches.  AR 272.  He cannot drive at night because the headlights of other cars will cause headaches.  AR 273.  He does not have a social life.  AR 273.  He has trouble eating because taking so many aspirin makes him nauseous.  AR 273.  He has trouble sleeping because he can't lie on his back due to the pressure on the back of his head.  AR 273.  Sometimes he wakes up with a headache so he has to sit upright in a chair, but then his back starts hurting and he had to get up and walk around.  AR 273-274.  He averages three to four hours of sleep per night.  AR 274.  Plaintiff also has trouble concentrating and forgets things if they are not written down.  AR 274.  He could follow instructions if they were written down.  AR 274.

Plaintiff's treating physician is Dr. Brockman, but Plaintiff has told him that he wants to see another doctor because he believes "there's got to be a specialist out there that can hopefully help me better than he is."  AR 275.  Dr. Brockman sent Plaintiff to physical therapy, but they "gave up" on him because the minor exercises caused headaches.  AR 275.

When asked about the side effects of his medication, Plaintiff stated that his nighttime medicine to help him sleep makes him a little drowsy, and is starting not to work because he is still waking up with headaches.  AR 276.  Plaintiff stated that his hands are numb almost every morning when he wakes up.  AR 278.

Plaintiff thought he could walk for one half-hour and could stand for 15-20 minutes.  AR 277.  He could sit for 15-20 minutes without fidgeting and could lift 25-30 pounds with his arms only.  AR 277.  He cannot stoop or crouch without pain in his back.  AR 277.

Plaintiff testified that he uses reading glasses that correct his vision, but can't wear them for more than 30-45 minutes because his eyes start to hurt "very, very much."  AR 279, 284.  If he walks too fast, he gets short of breath and dizzy.  AR 279.  He has constant neck, head and back pain and about "half as much" pain in his shoulders and arms.  AR 279-280.  He also has pain in his right hip and legs from his low back problem.  AR 280.  His worst pain is his head pain.  AR 281.  It rates as a 10 (on a scale from 1 to 10) at its worst.  AR 281.

1   When questioned by his attorney, Plaintiff explained that he is light sensitive and wears

2   dark glasses constantly outside and sometimes inside.  AR 283.  He takes between 12 to 18

3   aspirin and Excedrin migraine per day and has taken as many as 27 per day when the pain is

4   worse.  AR 284.  His sleep pattern makes him fatigued and tired during the day.  AR 285.

5   The vocational expert ("VE") testified that Plaintiff's prior position as a welder was

6   medium, skilled work.  AR 287.

7   The ALJ asked the VE to assume a person of Plaintiff's age, education, and past relevant

8   work, who could sit for six hours, stand for six hours and walk for six hours in an eight hour day,

9   who could lift 50 pounds occasionally and 25 pounds frequently, and who could not push or pull.

10   AR 287.  This person could perform some welding positions.  AR 287.

11   For the second hypothetical, the ALJ asked the VE to assume an individual who could lift

12   50 pounds occasionally and 25 frequently, could stand and walk for four hours and sit for six

13   hours in an eight hour day, could occasionally climb, balance, stoop, kneel, crouch, crawl, and

14   who had to avoid heights and machinery.  AR 288.  This person could perform the jobs of

15   cashiering (15,000), which is classified as light but has positions where it's performed as

16   sedentary, and garage attendant (6,500).  AR 288.

17   For the third hypothetical, the ALJ asked the VE to assume an individual who could lift

18   20 pounds occasionally and 10 frequently, could stand and walk for four hours and sit for six

19   hours in an eight hour day, could occasionally climb, balance, stoop, kneel, crouch, crawl, and

20   who had to avoid heights and machinery.  AR 288.  This person could also perform the positions

21   of cashiering and garage attendant.  AR 289.

22   If this person could only lift 10 pounds occasionally and five pounds frequently, he could

23   still perform the positions of cashiering and garage attendant.  AR 289.  If this person could lift

24   five pounds occasionally and frequently, could sit and walk two hours each, and sit for six hours,

25   this person could not perform any work.  AR 289.

26   When questioned by Plaintiff's attorney, the VE indicated that a person who had to take

27   an average of one or two days off per week because of headaches, could not perform any work.

28   AR 289.

Plaintiff's attorney asked the VE to assume the limitations in Dr. Brockman's February 26, 2003, assessment.  AR 290.  This person would not be able to perform any work.  AR 291.

Medical Evidence

_____On August 6, 1996, Plaintiff was seen in the emergency room after a large pipe struck the back of his head and knocked his head forward into another pipe.  AR 118.  X-rays of the cervical spine were negative and there was no clinical evidence of cervical spine injury.  AR 119.  Plaintiff had full range of motion in his neck and there was no tenderness to palpation or movement to the cervical spine.  AR 119.  A CT scan of the head showed no acute pathology.  AR 119.  He was diagnosed with acute blunt head trauma, concussion and frontal forehead abrasion and contusion.  AR 120.

_____On August 13, 1996, Plaintiff was examined by neurologist Oscar N. Abeliuk, M.D.  Plaintiff was most concerned about blurry vision and trouble focusing, as well as occasional pain along his spine.  Plaintiff's mental status examination was unremarkable.  There were no fundoscopic abnormalities of Plaintiff's eyes, and despite his subjective symptoms of numbness on the right side of his head, there was no objective deficit.  He had mild hearing loss.  He had full range of motion in his neck with slight tenderness on palpation.  Range of motion of the thoracic spine and lumbrosacral spine was within normal limits, but there was tenderness on palpation throughout the spine.  Dr. Abeliuk reported a hematoma in the right forehead area and around the eye, which he predicted would heal.  Plaintiff's symptoms of tinnitus, hearing loss, difficulty focusing and blurred vision were benign and had a good prognosis.  Plaintiff's cervical, thoracic and lumbrosacral spine strain and sprain were mild and resolving.  Dr. Abeliuk opined that Plaintiff could return to work with only the limitation of not working at heights due to the ringing in his ears and difficulty focusing.  AR106-110.

Plaintiff saw optometrist James S. Linville, O.D., on January 30, 1997.  Plaintiff had a small refractive error in his distance vision and needed help with focusing on near objections and reading.  With corrective lenses, Plaintiff could see 20/20 with each eye, near and far.  AR 111.

_____On March 28, 1997, Plaintiff underwent a neuropsychological consultation performed by Randall C. Epperson, Ph.D.  Plaintiff indicated that he suffered daily headaches and was

1   photophobic and noise intolerant to grinding or pounding.  He was not taking any prescription

2   medications but took 4-8 aspirin per day.  Testing indicated that Plaintiff was not attempting to

3   malinger or exaggerate his symptoms and showed an impairment of short-term memory.  Dr.

4   Epperson diagnosed pain disorder and adjustment disorder with depressed mood and anxiety, and

5   recommended 10 outpatient therapy sessions for Plaintiff's memory problems.  AR 164-172.

6   _____In October 1997, Plaintiff saw orthopedist Jon F. P. Sigurdson, M.D.  Plaintiff

7   complained of persistent stiffness, pain and soreness in the neck and back, and radiation of pain

8   and numbness down the right leg.  Dr. Sigurdson described Plaintiff as "somewhat overweight."

9   Plaintiff had no significant objective orthopedic findings and Dr. Sigurdson indicated that he

10  should be precluded from very heavy lifting.  He did not believe that Plaintiff needed any further

11  treatment from an orthopedic standpoint.  AR 122-126.

12      Also in October 1997, Plaintiff returned to Dr. Epperson, complaining of daily headaches,

13  forgetfulness, and depression.  Dr. Epperson diagnosed a serious mood disorder secondary to his

14  injury, but opined that he could be placed in a simpler, more redundant type of work where he is

15  not responsible for figuring out the solution to problems on his own and could complete tasks in

16  a well-specified manner.  AR 158-163.

17      On December 1, 1997, Plaintiff saw Alan G. Schaffert, M.D.  Plaintiff described blurry

18  vision, headaches, ear aches, ringing in his ears, decrease in his sense of smell, neck pain,

19  numbness and pain in his right arm, and ankle pain.  Dr. Schaffert described Plaintiff as a

20  "heavily built individual."  He disagreed with Dr. Epperson's assessment that Plaintiff accurately

21  reported his condition and felt there was "a good deal of exaggeration in this particular case."

22  AR 130-133.

23  _____Plaintiff saw Alan Yates, M.D., on December 4, 1997.  He found Plaintiff to have

24  significant bilateral and symmetrical sensorineural hearing loss at high frequencies.  AR 141.   In

25  January 1998, Dr. Yates indicated that his hearing loss was permanent and stationary, as long as

26  Plaintiff was cautious about noise protection.  AR 139.

27      In February 1998, Dr. Epperson diagnosed a pain disorder associated with Plaintiff's

28  medical condition and psychological factors.  Plaintiff's depression and anxiety had resolved.  He

found no disability based on psychological factors and no limitations or work restrictions due to emotional or cognitive factors.  AR 154.  He indicated that Plaintiff needed no further treatment for his emotional issues and was appropriate for vocational retraining.  AR 156.

In an April 1998, letter, Dr. Epperson explained that indoor lighting causes some discomfort but is not incapacitating.  AR 152.  He again explained that Plaintiff was an accurate reporter and passed three separate tests for malingering.  AR 152.  Dr. Epperson opined that because of his headaches, Plaintiff fell into the 20% disability rating category, moderate to severe, producing a marked handicap in performing activities that precipitate pain.  AR 153.

The next record of medical treatment is from July 24, 2002, when Plaintiff saw consultive examiner Harish P. Porecha, M.D.  Upon examination, Plaintiff had normal ranges of motion, some tingling in the hands and positive Tinel's sign in the right middle finger.  He diagnosed postconcussion headaches and degenerative joint disease of the cervical and lumbar spine.  Dr. Porecha also thought Plaintiff "probably" had carpal tunnel syndrome bilaterally.  He opined that Plaintiff could not sit for a long time because of back pain and had to get up and walk around.  AR 186-189.

Also on July 24, 2002, Plaintiff underwent a psychological evaluation by Laurie R. Weiss, Ph.D.  Plaintiff reported migraine headaches, ringing in his ears, numbness in his arms, pain in his back and vision problems.  His only medication was Excedrin.  Dr. Weiss described Plaintiff as an "attractive overweight Caucasian man of medium stature."  During testing, Plaintiff was cooperative and displayed good effort.  His concentration, attention and memory skills were adequate.  He had a slight weakness in short term memory but nothing that would suggest a gross deficit.  Plaintiff was able to perform all activities of daily living, including simple household chores and grocery shopping unattended.  Dr. Weiss opined that Plaintiff could understand, remember and carry out simple, detailed and complex instructions without special or additional supervision.  However, Dr. Weiss indicated that Plaintiff was unable to act appropriately with her.  AR 190-193.

On July 31, 2002, State agency physician Esther Cistone, M.D., completed a Physical Residual Functional Capacity Assessment form and opined that Plaintiff could occasionally lift

50 pounds, 25 pounds frequently, stand/walk about six hours in an eight hour day, and sit about six hours in an eight hour day.  Plaintiff was unlimited in pushing/pulling and could occasionally climb, balance, stoop, kneel, crouch and crawl.  He had no manipulative limitations as his carpal tunnel syndrome appeared nonsevere.  He had no communicative limitations because his high frequency hearing loss does not significantly affect hearing of speech and environmental noise.  Plaintiff had to avoid concentrated exposure to hazards such as heights.  AR 194-201.  These findings were affirmed on September 26, 2002.  AR 201.

On August 22, 2002, a State Agency physician opined that Plaintiff had no medically determinable psychiatric impairment.  AR 202.  This finding was affirmed on September 26, 2002.  AR 202.

At the hearing, Plaintiff submitted a report dated February 26, 2003, by Tracy Brockman, M.D.  AR 252.  Dr. Brockman began treating Plaintiff in December 2002 and indicated that he had a poor response to physical therapy as it increased his symptoms and pain.  AR 252.  He prescribed Midrin and Imitrex, and explained that Plaintiff had decreased range of motion in the upper spine.  AR 252.  He opined that Plaintiff could occasionally lift up to 50 pounds and carry up to 20 pounds, and explained that stress and strain lead to increased pain and headaches.  He thought Plaintiff could sit for four hours at two hour intervals, stand for four hours at one hour intervals, and walk for zero to one hour in an eight hour workday, as exertion increases his pain and headaches.  AR 254.  The use of his hands and feet was not affected.  He could occasionally climb, balance, stoop, crouch, kneel, crawl, push/pull and reach.  He should avoid heights, moving machinery, chemicals, humidity, dust, noise, temperature extremes, vibrations and fumes because these things will increase his headaches.  AR 256.

In support of his request for reconsideration, Plaintiff submitted a report by Dr. Brockman, dated January 20, 2004.  He diagnosed Plaintiff with chronic severe migraines and neck and back pain and again indicated that Plaintiff had a poor response to treatment.  Medication improved his mood but not his headaches.  Plaintiff takes 15-30 Excedrin per day.  He opined that Plaintiff could occasionally lift up to 50 pounds and carry up to 20 pounds, could sit for three hours at 2 hour intervals, could stand for three hours at one hour intervals, and could

not walk.  Dr. Brockman explained that exertion leads to increased headaches and neck and back pain.  He also noted that Plaintiff may need to rest frequently in dark, quiet places when his headache pain is severe and would likely need frequent rest breaks.  AR 258-262.

ALJ's Findings

The ALJ determined that Plaintiff had the severe impairments of headaches, tinnitus with symmetric sensorineural hearing loss, back pain and blurred vision.  AR 15.  After reviewing the medical evidence and determining that Plaintiff's complaints were not fully credible, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to lift 50 pounds occasionally and 25 frequently, be on his feet at least half of the workday, to sit six hours and occasionally climb, bend, stoop, crouch and crawl.  AR 21.  Plaintiff had to avoid concentrated exposure to heights and machinery.  AR 22.  The ALJ reviewed the State Agency's vocational consultants' findings that Plaintiff could perform the positions of day worker, doorkeeper and scrap sorter.  AR 22.  The VE testified that Plaintiff could also perform the positions of cashier and garage attendant.  AR 22.  Based on these findings, the ALJ concluded that Plaintiff could make a successful adjustment to other work existing in significant numbers in the national economy.  AR 22.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

1   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

2   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

3   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

4   Cir. 1987).

5                                          **REVIEW**

6          In order to qualify for benefits, a claimant must establish that he is unable to engage in

7   substantial gainful activity due to a medically determinable physical or mental impairment which

8   has lasted or can be expected to last for a continuous period of not less than 12 months.  42

9   U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

10  such severity that he is not only unable to do her previous work, but cannot, considering his age,

11  education, and work experience, engage in any other kind of substantial gainful work which

12  exists in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

13  The burden is on the claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

14  Cir. 1990).

15         In an effort to achieve uniformity of decisions, the Commissioner has promulgated

16  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

17  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3]  Applying this process in this case, the ALJ

18  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

19  disability; (2) has an impairment or a combination of impairments that is considered "severe"

20  (headaches, tinnitus with symmetric sensorineural hearing loss, back pain and blurred vision)

21  based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

22  impairment or combination of impairments which meets or equals one of the impairments set

23  forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work; (5)

24  but retains the RFC to perform a significant number of jobs in the national economy.  AR 23-24.

25         Plaintiff argues that the ALJ (1) failed to provide clear and convincing reasons for

26  rejecting Plaintiff's testimony; (2) failed to consider Plaintiff's obesity; (3) failed to give specific

27  and legitimate reasons for disregarding the opinions of Plaintiff's treating and examining

28

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

1   physicians; (4) overlooked significant relevant evidence in determining Plaintiff's RFC; (5)

2   improperly ignored lay witness testimony; and (6) improperly relied on the State Agency's

3   vocational consultant.

4                                           **DISCUSSION**

5   A.      Plaintiff's Testimony

6           Plaintiff contends that the ALJ erred by improperly discrediting Plaintiff's allegations

7   based on his failure to obtain prescribed medical treatment and his lack of regular medical

8   treatment.

9           The ALJ is required to make specific findings assessing the credibility of plaintiff's

10  subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  In rejecting

11  the complainant's testimony, "the ALJ must identify what testimony is not credible and what

12  evidence undermines the claimant's complaints."  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir.

13  1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir.

14  1988)).  Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the

15  severity of her pain and impairments is unreliable, the ALJ must make a credibility determination

16  with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily

17  discredit claimant's testimony.  *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

18          "The ALJ may consider at least the following factors when weighing the claimant's

19  credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's]

20  testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work

21  record, and testimony from physicians and third parties concerning the nature, severity, and effect

22  of the symptoms of which [claimant] complains."  *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d

23  789, 792 (9th Cir. 1997).  "If the ALJ's credibility finding is supported by substantial evidence in

24  the record, we may not engage in second-guessing."  *Id.*

25          Here, the ALJ recognized that Plaintiff had a history of headaches particularly on

26  extended periods of exertion, but explained that even a moderate level of pain is not, by itself,

27  incompatible with the performance of certain levels of sustained work activity.  AR 20.  The ALJ

28  explained that although the medical evidence documents certain impairments, it does not support

                                              11

1   Plaintiff's alleged level of severity.  AR 20.  The ALJ explained that other than being examined

2   by medical sources in connection with his workers' compensation claim and present disability

3   claim, Plaintiff has received no regular, ongoing medical treatment for any of his complaints.

4   AR 20.  The ALJ characterized Plaintiff's headaches as his most bothersome problem, but

5   despite his claim of debilitating headaches, he has not been referred to a specialist or for further

6   diagnostic studies and has not required acute medical treatment because of headaches.  AR 20.

7   Although Plaintiff was prescribed Imitrex and Midrin, he stopped taking the Imitrex because it

8   did not help and instead chose to take large doses of Excedrin rather than seeking out other pain

9   relieving modalities.  AR 21.  With regard to his vision complaints, the ALJ noted that Plaintiff

10  lacked the funds to get glasses, but never obtained less expensive drug store glasses despite the

11  encouragement of Dr. Epperson.   AR 21.

12          Plaintiff first argues that the ALJ improperly considered Plaintiff's failure to get glasses.

13  According to Plaintiff, he did not fill the prescription for corrective lenses or purchase interim

14  glasses because he lacked the funds to do so.  Plaintiff is correct that an ALJ may not discredit a

15  claimant for not obtaining medical treatment where the claimant cannot afford it.  <u>Gamble v.</u>

16  <u>Chater</u>, 68 F.3d 319, 322 (9th Cir. 1995).  However, Plaintiff's argument misunderstands the

17  ALJ's use of the information.  Plaintiff's authority deals with a denial of benefits where the

18  claimant has a *disabling impairment* and fails to follow treatment that may restore the claimant's

19  ability to work.  20 C.F.R. § 404.1530.  Here, the ALJ found that Plaintiff did not have a

20  disabling impairment, and evaluated Plaintiff's noncompliance only in the context of evaluating

21  his credibility.

22          In any event, the ALJ acknowledged that Plaintiff had a vision problem but properly

23  determined that it was not a severe impairment because with corrective lenses, his vision was

24  20/20 in both eyes.  AR 21. *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir.1983).

25  (an impairment that can reasonably be controlled by medication cannot serve as a basis for

26  finding a disability).  Indeed, at the hearing, Plaintiff conceded that his glasses corrected his

27  vision.  AR 278-279.  There is no evidence in the record to support Plaintiff's complaints of eye

28  pain after wearing his glasses for a certain amount of time.

1    Similarly, the ALJ did not err in commenting on the fact that there was no evidence of

2    medical treatment from February 1998 through July 2002.  That Dr. Brockman noted in his

3    February 2003 medical report that physical therapy failed because it increased Plaintiff's pain

4    does not change the fact that there was a significant gap in treatment.  *Burch v. Barnhart*, 400

5    F.3d 676, 681 (9th Cir. 2005) (ALJ is permitted to consider lack of medical treatment in

6    assessing credibility).  Nor is this gap in treatment overcome by Plaintiff's testimony that he

7    asked Dr. Brockman, who began treating Plaintiff in December 2002, for a referral to another

8    doctor.

9    Finally, insofar as Plaintiff contends that the ALJ incorrectly determined that Plaintiff did

10   not have a mental impairment based on the facts that his depression and anxiety had resolved and

11   that he had no current history of psychiatric treatment or prescription psychotropics except low

12   dose antidepressants, his argument fails.  Plaintiff points to Dr. Brockman's prescription for

13   Prozac in 2004 to refute the ALJ's statement, but this is irrelevant as Plaintiff's date last insured

14   was December 31, 2002, and he had to prove disability prior to that date.  *See Morgan v.*

15   *Sullivan*, 945 F.2d 1079, 1080 (9th Cir. 1991) (to obtain disability insurance benefits under Title

16   II, a claimant must show that he was disabled prior to his date last insured).  While medical

17   evidence subsequent to the date last insured may be relevant in some circumstances, those

18   circumstances do not exist here.  *See eg., Smith v. Bowen*, 849 F.2d 1222 (9th Cir. 1988).

19   Indeed, Dr. Epperson indicated in February 1998 that Plaintiff's depression and anxiety had

20   resolved.  AR 154.

21   B.   Plaintiff's Obesity

22   _____Next, Plaintiff argues that the ALJ failed to take his obesity into consideration during the

23   sequential evaluation process.  Plaintiff contends that both Plaintiff's testimony and his medical

24   records establish that his obesity is a medically determinable impairment.  As support for his

25   argument, Plaintiff cites the notations in the record of his height and weight and Plaintiff's body

26   mass index, which defines him as obese.

27   Pursuant to SSR 02-1p, obesity must be considered throughout the sequential evaluation

28   process, including when determining an individual's RFC.  "The combined effects of obesity

1   with other impairments may be greater than might be expected without obesity." SSR 02-1p.

2   The Ninth Circuit recently held that, pursuant to SSR 02-1p, the ALJ must consider obesity in

3   determining RFC based on the information in the case record. *Burch v. Barnhart*, 400 F.3d 676,

4   683 (9th Cir. 2005).

5          Here, the ALJ noted that Dr. Sigurdson characterized Plaintiff as "somewhat

6   overweight," but he did not find Plaintiff's obesity, either alone or in combination with other

7   impairments, severe. AR 17. This was not error given the complete lack of support in the

8   medical record. Although the record contained evidence of Plaintiff's weight and vague

9   descriptions of his body size, there is no evidence that Plaintiff's "obesity" resulted in any

10  functional limitations. Indeed, Plaintiff very clearly attributes his main complaints to his August

11  1996 incident. *Burch*, 400 F.3d at 683 (an "ALJ is not required to discuss the combined effects

12  of a claimant's impairments or compare them to any listing in an equivalency determination,

13  unless the claimant presents evidence in an effort to establish equivalence." ) Moreover, contrary

14  to Plaintiff's implied argument, the simple fact that Plaintiff may be obese does not automatically

15  make him disabled.

16  C.     Treating and Examining Physicians' Opinions

17         Plaintiff contends that the ALJ erred by not specifically discrediting the limitations

18  imposed by Plaintiff's treating physicians Dr. Brockman and Dr. Epperson. He also contends

19  that the ALJ improperly rejected the opinions examining physicians Dr. Porecha and Dr. Weiss.

20         Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

21  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

22  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

23  physicians). As a general rule, more weight should be given to the opinion of a treating source

24  than to the opinion of doctors who do not treat the claimant. *Winans v. Bowen*, 853 F.2d 643,

25  647 (9th Cir.1987). Even if the treating doctor's opinion is contradicted by another doctor, the

26  Commissioner may not reject this opinion without providing "specific and legitimate reasons"

27  supported by substantial evidence in the record. The opinion of an examining physician is, in

28  turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*,

908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984).  As is the

case with the opinion of a treating physician, the ALJ must provide "clear and convincing"

reasons for rejecting the uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at

506.  If the opinion is contradicted by another doctor, it can only be rejected for specific and

legitimate reasons that are supported by substantial evidence in the record.  *Andrews v. Shalala,*

53 F.3d 1035, 1043 (9th Cir.1995).

*Treating Physicians*

Plaintiff first contends that the ALJ should have included in the RFC limitations set forth

by Dr. Brockman and Dr. Epperson because the ALJ did not specifically discredit their opinions.

In support of his argument, Plaintiff points to Dr. Brockman's January 2004 assessment and Dr.

Epperson's April 1998 letter reiterating his findings at the time of his final evaluation in February

1998.  Plaintiff points out that in response to the hypothetical containing Dr. Brockman's

February 2003 restrictions, the VE testified that the individual would not be able to perform

Plaintiff's past relevant work or any other work in the national economy.  AR 219.

In his decision, the ALJ thoroughly reviewed the medical evidence, including Dr.

Brockman's February 2003 assessment and Dr. Epperson's April 1998 assessment.  AR 16-17,

19.  The main limitations not included in the RFC are the environmental restrictions imposed

because of Plaintiff's alleged migraines, such as avoiding exposure to bright lights, loud noises,

chemicals, humidity, dust, temperature extremes, vibrations and fumes.  While the ALJ

precluded Plaintiff from concentrated exposure to heights and machinery, he did not include all

of the environmental restrictions described above.  AR 21-22.

Plaintiff correctly notes that the ALJ did not specifically explain why he rejected these

portions of Dr. Brockman's and Dr. Epperson's opinions.  However, given that these

environmental restrictions were a result of Plaintiff's alleged migraine-type headaches and that

the ALJ very thoroughly detailed why Plaintiff's headaches were not as severe as he alleged, it

appears that by rejecting Plaintiff's subjective complaints of headaches, he necessarily rejected

the accompanying limitations.  *Fair v. Bowen*, 885 F.2d 597, 605 (9th 1989) (An ALJ may reject

the treating physician's opinion because it was based on the claimant's discredited subjective

complaints).  Indeed, even Dr. Epperson noted that the discomfort caused by indoor lighting was not incapacitating.  AR 152.

A majority of the remaining limitations were either included in, or not inconsistent with, the ALJ's RFC finding.  For example, Dr. Epperson found a 20% disability rating that produced a marked handicap in performing activities that precipitate pain, such as Plaintiff's prior welding position.  The ALJ's RFC precluded Plaintiff from returning to his work as a welder.  Similarly, Dr. Brockman indicated that Plaintiff could occasionally lift 50 pounds and carry 20, and could stand for four hours during the workday.  The ALJ found that Plaintiff could lift 50 pounds occasionally and 20 frequently, and could stand at least four hours during the workday.  The ALJ recognized the similarities by characterizing the RFC as "similar" to the assessment of Dr. Brockman.  AR 22.

Insofar as the RFC found a greater capacity for sitting[4], the ALJ explained throughout his opinion that the evidence did not support such a restriction.  For example, the ALJ notes that Dr. Abeliuk found that Plaintiff's cervical, thoracic and lumbar spine strain and sprain were only mild and resolving, and that he could return to work with no restrictions other than a preclusion from working at heights.  AR 16.  The ALJ also noted Dr. Sigurdson's lack of objective orthopedic findings, his opinion that Plaintiff's neck and back symptoms were "intermittent slight," becoming severe with very heavy lifting, and his opinion that Plaintiff needed no further cervical and/or thoralumbar spine treatment.  AR 17, 125.

*Examining Physicians*

Plaintiff next contends that the ALJ erred by (1) giving less weight to the opinion of consultive neurologist Dr. Porecha regarding Plaintiff's possible carpal tunnel syndrome and (2) failing to discredit the opinion of consultive psychologist Dr. Weiss regarding Plaintiff's inability to interact with her.

In his decision, the ALJ set forth in detail Dr. Porecha's examination and findings, including the objective findings of a positive Tinel's sign with a tingling of the right middle

---

[4] Dr. Brockman opined that Plaintiff could sit for four hours.  The ALJ determined that Plaintiff could sit for six hours.  AR 21.

finger and a little tingling on squeezing of the Jamar dynamometer.  AR 18.  However, the ALJ did not include any restrictions relating to carpal tunnel syndrome in his RFC.  The ALJ explained that "while Plaintiff may have some signs consistent with carpal tunnel syndrome, this disorder has not been fully evaluated and the claimant has not been referred for more diagnostic testing or specialized evaluations."  AR 20.

This determination is supported by the medical record, in which only Dr. Porecha discusses carpal tunnel syndrome as a "possibility" and imposed no corresponding limitations. AR 189.  Plaintiff did not testify to arm or hand pain and, based on his daily activities, does not seem to be hampered by any such pain.  AR 271.  Although Plaintiff told Dr. Schaffert that he suffered from numbness, tingling and pain in his right arm, Dr. Schaffert believed that Plaintiff was exaggerating a "good deal" overall and imposed no restrictions.  AR 131-133.  Similarly, Dr. Brockman specifically indicated that the use of Plaintiff's hands and feet were not affected and that he could continuously use both hands for grasping and fine manipulation.  AR 254.

The ALJ also fully sets forth Dr. Weiss' examination and findings, and adopted her conclusion that Plaintiff could essentially meet the mental demands of renumerative competitive work activity.  AR 21.  In his description of Dr. Weiss' findings, the ALJ stated that Plaintiff "interacted appropriately."  AR 18.  However, Dr. Weiss' report states, "[t]he claimant was unable to interact appropriately with this examiner."  AR 193.

Even if the ALJ correctly cited Dr. Weiss' findings, he did not err in failing to include such a limitation in his RFC.  First, Dr. Weiss' statement is not explained, and is questionable in light of Plaintiff's unremarkable examination.  Plaintiff was cooperative and displayed good effort, had adequate concentration, attention and memory skills, demonstrated adequate problem solving ability, was able to concentrate and attend for the duration of the evaluation, was able to understand, remember and carry out simple, detailed and complex instructions without special or additional supervision, and was able to endure the stress of the interview and the testing process.

1    AR 193.  Second, no other physician, including Dr. Epperson, noted such a problem with

2    interaction and/or imposed any resulting limitations.[5]

3    D.    Plaintiff's RFC

4          Plaintiff contends that the ALJ overlooked significant relevant evidence in determining

5    Plaintiff's RFC.  Specifically, Plaintiff argues that the ALJ failed to consider (1) the effects of his

6    chronic headaches, (2) the side effects of Plaintiff's medications; and (3) his carpal tunnel

7    syndrome.

8          RFC is an assessment of an individual's ability to do sustained work-related physical and

9    mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a

10   week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment must be based on all of

11   the relevant evidence in the record, including the effects of symptoms that are reasonably

12   attributed to a medically determinable impairment.  SSR 96-8p.  In addition, the adjudicator

13   "must consider limitations and restrictions imposed by all of an individual's impairments, even

14   those that are not 'severe,'" because such limitations may be outcome determinative when

15   considered in conjunction with limitations or restrictions resulting from other impairments.  SSR

16   96-8p.

17         *Plaintiff's Headaches*

18         In support of his argument, Plaintiff relies on Dr. Brockman's January 2004 assessment

19   which imposed limitations, such as an inability to sit and stand more than three hours and a

20   requirement that Plaintiff avoid noise and other environmental hazards and be able to frequently

21   rest in a dark and quiet place, based on the increase in pain and headaches caused by exertion

22   with any activity.  AR 260-262.  Dr. Brockman's February 2003 assessment imposes similar

23   limitations for the same reason.  AR 253-256.

24         The ALJ did not err in failing to include the limitations based on Plaintiff's headaches in

25   his RFC.  In his decision, the ALJ acknowledged Plaintiff's headaches and pain, but explained:

26   _____

27         [5] Although Plaintiff argues that a "disability evaluator" suggested a limitation in working with others
     and the public, such a limitation was not imposed by the reviewing State Agency physician.  AR 222.  On August 22,
     2002, a State Agency physician opined that Plaintiff had no medically determinable psychiatric impairment.  AR

28   202.  This finding was affirmed on September 26, 2002.  AR 202.

The undersigned recognizes the claimant has a history of headaches particularly on extended periods of exertion and the undersigned has taken this factor into consideration in reaching an assessment of the claimant's residual functional capacity concluded herein. However, even a moderate level of pain is not, by itself, incompatible with the performance of certain levels of sustained work activity.  In this case, neither the objective medical evidence or inference therefrom, nor any other nonmedical evidence establishes that the claimant's ability to function has been so severely impaired so as to preclude the performance of all work activities.

AR 20.

Indeed, the ALJ recognized that Plaintiff's complaints did not totally lack merit and noted that the record documents a history of Plaintiff's complaints of chronic headaches.  AR 20. However, as explained above, the ALJ properly rejected Plaintiff's allegations of the severity of his headaches and was therefore not required to include any related limitations.

*Side Effects of Medication*

Plaintiff points to his testimony that he experiences nausea from taking so many aspirin and that the medication he takes to help him sleep makes him drowsy.  Plaintiff then cites side effect information for Plaintiff's medication from an internet website.

Plaintiff correctly states that medication side effects should be taken into consideration when determining a claimant's RFC.  *Varney v. Secretary of Health & Human Serv.,* 846 F.2d 581, 585 (9th Cir. 1988) (side effects of prescribed medication may have a significant effect on an individual's ability to work, and therefore should be considered in making a disability determination).  However, alleged side effects need not be considered where no objective evidence supports the allegations.  *Thomas v. Barnhart,* 278 F.3d 947, 960 (9th Cir. 2002).

Here, the only evidence of Plaintiff's side effects comes from his own testimony, which the ALJ properly rejected as explained above.  Moreover, as to the drowsiness Plaintiff experiences from taking large doses of Excedrin, the ALJ viewed this as a choice Plaintiff favors rather than seeking more effective pain relief.  AR 21.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982) (an ALJ is entitled to draw inferences logically flowing from the evidence). As to the confusion Plaintiff alleged, the ALJ explained that on testing by Dr. Weiss, Plaintiff was cooperative, displayed good effort, good persistence, adequate problem solving skills, and was found to be functioning in the average range of intelligence without significant deficits in concentration.  AR 21.

*Carpal Tunnel Syndrome*

Plaintiff points to Dr. Porecha's diagnosis of carpal tunnel syndrome and argues that the ALJ erred by failing to account for any resulting manipulative or postural limitations. As explained above, however, there was simply no evidence in the record that Plaintiff's "probable" carpal tunnel syndrome resulted in any functional limitations.

E.     Lay Witness Testimony

_____Next, Plaintiff argues that the ALJ erred by improperly ignoring the lay witness testimony of Barbara Staggs, who completed a Third Party Daily Activities Questionnaire. While Plaintiff acknowledges that the ALJ discussed her testimony, he contends that the ALJ erred by not expressly discrediting her testimony.

Lay witness testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ may reject such testimony if he does so expressly, in which case "he must give reasons that are germane to each witness." *Id.* While the ALJ need not discuss lay witness testimony that pertains to whether or not an impairment exists, *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996), lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence and therefore cannot be disregarded without comment. *Dodrill*, 12 F.3d at 919.

With regard to Ms. Staggs' testimony, the ALJ stated:

In a July 5, 2002, Activities of Daily Living Questionnaire, Barbara Staggs, the woman who provides the claimant room and board for his work around her place pretty much reiterated and corroborated the claimant's statements. Ms. Staggs further notes that the claimant has constant headache pain, can't concentrate very long and has a short temper due to pain. She notes that the claimant takes a lot of rest periods due to his headaches and it takes him a long time to complete tasks for fear of headache if he pushes himself too hard. Ms. Staggs also noted that she does 95% of the cooking, however, the claimant does and has no problem barbequing at least once a week.

AR 19.

To the extent that Ms. Staggs' testimony mirrors that of Plaintiff, the ALJ provided specific reasons for rejecting it by explaining why he rejected Plaintiff's complaints. The remaining testimony is, at best, only slightly probative given the overall state of the medical record. Any error on the part of the ALJ in failing to specifically explain why he didn't credit it,

1   was harmless error, at most.  *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2004)

2   (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion).

3   F.    Vocational Expert Testimony

4   _____Finally, Plaintiff contends that (1) the ALJ failed to afford Plaintiff an opportunity to

5   cross-examine the State Agency vocational consultant; and (2) the vocational findings are

6   impermissibly in conflict with the Dictionary of Occupational Titles ("DOT").

7        *Cross Examination*

8        In his vocational assessment, the ALJ explained that the State Agency vocational

9   consultant identified the positions of day worker, doorkeeper and scrap sorter as alternative

10  positions that Plaintiff can perform given his age, education, vocational background and RFC for

11  a limited range of medium work.  AR 22.  The ALJ then credited the VE testimony that Plaintiff

12  could perform the positions of cashier and garage attendant.  AR 22.  He concluded, "[b]ased on

13  the State Agency's vocational consultant's previous determinations and the credible testimony of

14  the vocational expert, the undersigned concludes that the claimant is capable of making a

15  successful adjustment to other work that exists in significant numbers in the national economy."

16  AR 22-23.

17       Plaintiff, citing *Richardson v. Perales*, 402 U.S. 389 (1971), contends that he was entitled

18  to cross-examine the State Agency vocational consultant.  Plaintiff contends that the ALJ failed

19  to include any finding regarding the number of positions for each of the jobs identified by the

20  vocational consultant, making it impossible to determine if these jobs existed in significant

21  numbers.  Plaintiff also explains that there is no evidence of the name of the consultant or the

22  findings in the record, making it impossible for Plaintiff to subpoena the consultant.  Finally,

23  Plaintiff contends that there was no evidence in the record that his attorney was notified of the

24  consultant's name or findings prior to the date of the ALJ's decision, therefore depriving Plaintiff

25  of an opportunity to respond to the consultant's findings.

26       In *Richardson v. Perales*, the Supreme Court determined that a written report by an

27  examining physician may be received as evidence in a disability hearing and, despite its hearsay

28  character and an absence of cross-examination, may constitute substantial evidence in finding the

21

1   claimant not disabled.  *Richardson,* 402 U.S. at 402.  At the outset of the analysis, the Court

2   recognized that under the Social Security Regulations, the strict rules of evidence applicable in

3   the courtroom, "are not to operate at social security hearings so as to bar the admission of

4   evidence otherwise pertinent."  *Id.* at 400.  However, the Court allowed the report because it

5   determined that the report was reliable and probative based in part on Plaintiff's ability to

6   subpoena and cross-examine the physician.  *Id.* at 402-405.

7           The Court recognizes that, under certain circumstances, a claimant should be permitted to

8   cross-examine the author of submitted evidence.  For example, in *Solis v. Schweiker*, 719 F.2d

9   301, 302 (9th Cir. 1983), the court determined that where a physician is a crucial witness whose

10  findings substantially contradict the other medical testimony, and when interrogatories are an

11  inadequate substitute for cross-examination, the claimant will be denied procedural due process

12  if his request to subpoena the physician is not granted.  However, the court recognized that a

13  claimant is not entitled to unlimited cross- examination, but rather "such cross-examination as

14  may be required for a full and true disclosure of the facts." 5 U.S.C. § 556(d).  *Id.* at 302; *see also*

15  *Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999) (observing that cross-examination is not an

16  absolute right in administrative cases).  The ALJ has discretion to decide when

17  cross-examination is warranted.  *Id.*

18          Here, the evidence was not so crucial so as to require cross-examination.  The ALJ

19  explicitly relied on both the consultant's and the VE's job findings.  AR 22.  Indeed, the ALJ

20  could have properly relied only upon the testimony of the VE, who was cross-examined by

21  Plaintiff's attorney.  AR 289-291.  The VE indicated that Plaintiff could perform the positions of

22  cashier (15,000 regionally) an garage attendant (6,500 regionally).  AR 288.  These positions

23  alone constitute a significant number of jobs available in the national economy.

24          *DOT*

25          Finally, Plaintiff argues that the jobs of day worker, doorkeeper and scrap sorter, as listed

26  in the DOT, are in conflict with the RFC.  Specifically, Plaintiff contends that these positions

27  require more exertion than the ALJ's RFC permits.  Again, however, because the ALJ could have

28

1    properly relied on *solely* the positions identified by the VE, any error was harmless. *Batson,* 359

2    F.3d at 1197.

3                                   **CONCLUSION**

4          Based on the foregoing, the Court finds that the ALJ's decision is supported by

5    substantial evidence in the record as a whole and is based on proper legal standards.

6    Accordingly, this Court DENIES plaintiff's appeal from the administrative decision of the

7    Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in

8    favor of Defendant Jo Anne B. Barnhart, Commissioner of Social Security and against Plaintiff,

9    Steven Olsen.

10        IT IS SO ORDERED.

11      **Dated:  September 7, 2005**             **/s/ Dennis L. Beck**

12    3b142a                               UNITED STATES MAGISTRATE JUDGE